1

2

3

4

5

6

7

The Honourable Richard A. Jones
United States District Court Judge

8

9

IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  WESTERN  DISTRICT  OF  WASHINGTON
SEATTLE  DIVISION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| PORTFOLIO INVESTMENTS, LLC, a Washington limited liability corporation; STEVEN J. NIKOLICH, both individually and upon behalf of the community property marital estate of STEVEN J. NIKOLICH and MARCIA A. NIKOLICH; MARCIA A. NIKOLICH, both individually and upon behalf of the community marital property estate of STEVEN J. NIKOLICH and MARCIA A. NIKOLICH; STEVEN J. NIKOLICH, managing member, PORTFOLIO INVESTMENTS, LLC, a Washington limited liability corporation,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>FIRST SAVINGS BANK NORTHWEST, a Washington state chartered bank; EXECUTIVE HOUSE, INC., a Washington corporation; JOHN P. MILLS, both individually and upon behalf of the community property marital estate; DAVID KROEGER; JEFF GREGG; JAMES PRESTON; VICTOR KARPIAK; FIRST FINANCIAL NORTHWEST, INC., a Washington corporation; FIRST | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL  NO.: 2:12-cv-00104-RAJ<br><br>DEMAND  FOR  JURY  TRIAL <u>RE</u>:<br>    SEVENTH  AMENDMENT<br><br><u>AMENDED COMPLAINT</u>:<br><br><u>RE</u>: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT OF 1970 ["RICO"] [TITLE 18 USC §§ 1961]<br>    RE: MULTIPLE RICO PRIMARY<br>    SECONDARY, DERIVATIVE, and<br>    CONSPIRACY  LIABILITY <u>RE</u>:<br>    <u>PINKERTON,  v.  UNITED STATES</u>,<br>    328 U.S. 640 (1946); RICO<br>    CONSPIRACY TO AID and ABET;<br>    and, RICO AIDING  and ABETTING<br>    RICO  CONSPIRACY <u>RE</u>: RICO<br>    <u>RESPONDEAT</u> <u>SUPERIOR</u><br><br>    [RICO § 1962(c)]<br>    [RICO § 1962(d)] |

AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

FINANCIAL DIVERSIFIED          )
CORPORATION, a Washington      )
corporation; TAX ATTORNEYS,    )
INC., a Washington corporation;)
SUSAN CHANG; JOHN E.           )
CICERO, II and MELANIE R.      )
CICERO, both individually and  )
upon behalf of their community )
property marital estate,       )
                               )
                               )
                Defendants.)
_____)

Plaintiffs Portfolio Investments, LLC, a Washington limited liability corporation, Steven J. Nikolich, and  Marcia A. Nikolich, both individually and upon behalf of their  community property marital estate, by and  through  plaintiffs' Amended Complaint allege against defendants as follows.

1.      Plaintiffs allege that during the last week of  January, 2006, John Mills, chief executive officer and board director of Executive House, Inc., ["Executive House"] Seattle, WA, telephoned   plaintiffs' offices at Portfolio Investments, LLC, Lake Tapps, WA, and  represented to plaintiffs that Mills' Executive House, Inc., had been acquired by First Savings Bank Northwest, [referred to herein after as "FSBNW," "First Savings Bank," or "FSB"].

2.      Plaintiffs allege that  Mills furthermore  represented to plaintiffs during the course of that teleconference that Mills would continue serving as president of  Executive  House  for a five [5] year term, thereby further assuring plaintiffs and other Executive  House  clientele that FSBNW would  perform  upon their behalf, that FSBNW would honour and  recognize   that pre-existing commercial business relationship.

3.      Plaintiffs allege that by December, 2007, Mills represented to plaintiffs and other similarly situated clientele that Mills was tendering his resignation as president of the company in order to retire.  Mills told plaintiff Steven J. Nikolich that Mills  was allegedly *persona non grata* at FSBNW and allegedly no longer welcome,  but  nonetheless  assured plaintiffs that plaintiffs' business interests and projects would be maintained, promoted, and advanced by FSBNW and FSBNW's corporate affiliates.

4.      Plaintiffs allege that at the time of Mills' submission of Mill's resignation from FSBNW  plaintiffs were unaware and without knowledge, and at no time did Mills, FSBNW,

1 Executive House, Inc., First   Financial Northwest, Inc., and/or   First Financial Diversified

2 Corporation disclose to plaintiffs  that Mills continued to maintain a business relationship with

3 FSBNW and Executive House, Inc.

4          5.      Plaintiffs allege that during all materially relevant  times herein both prior and

5 subsequent to the corporate acquisition of Executive House by FSB, John Mills, functioning in

6 Mills' duly authorized representative capacity as a corporate officer, manager, and/or director, and

7 with the express knowledge, consent, authorization, and/or acquiescence of FSB officers, managers,

8 directors, and/or  representatives, engaged in both a course of conduct and a pattern of practice of

9 advancing, promoting, implementing, and executing the bank's business of commercial and real

10 estate lending.

11          6.      Plaintiffs allege  that the unorthodoxy of Mills' conduct was formulated, intended,

12 designed, implemented, and executed for purposes of minimizing and/or eliminating the  necessity

13 of generating written documentation to confirm and substantiate the true intent of the parties to these

14 transactions.

15          7.      Plaintiffs allege that Mills, with the express knowledge, consent, authorization,

16 and/or acquiescence of FSBNW officers, managers, directors, and/or  representatives, regularly and

17 routinely generated various lending instruments for review, discussion, and ultimate execution by

18 plaintiffs and similarly situated clientele without the necessity of a notary public.

19          8.      Plaintiffs allege that Mills' conduct of aggressively prosecuting business upon behalf

20 of  both  FSBNW and Executive House,  as  described herein  above, that is, by consistently

21 eschewing issuance of written confirmatory letters by FSBNW and Executive House  to  plaintiffs,

22 and similarly situated clientele, to both corroborate  and substantiate oral representations made by

23 Mills to assure performance by FSBNW and Executive House, gave rise of serious issues of both

24 reliability  and   dependability, as well as veracity and truthfulness.

25          9.      Plaintiffs allege that during 2006 plaintiffs embarked   upon  a real estate

26 development  project consisting of  a fourteen [14]  lot high end development called "*Highlands*

27 *At The Harbor*," located in Gig Harbor, WA.  Plaintiffs presented to both Mills and Kroeger

28 plaintiffs' full scale drawings, written exposition and description of the project, and the financial

1    commitments necessary to facilitate and further the construction, development, and marketing of the

2    project. Mills and Kroeger both reviewed and assessed plaintiffs' submitted documentation.

3        10.    Plaintiffs' development would be comprised of 14 residential lots. Plaintiffs also

4    acquired two [2] commercial water front lots physically situated across the street from the fourteen

5    [14] lot location.

6        11.    Plaintiffs closed upon the two [2] commercial water front lots, paying approximately

7    $500,000.00, and thereby incurring a substantial interest payment of $7,300.00, per month, which,

8    including the remaining real property interests, plaintiffs incurred substantial interest payments of

9    approximately $40,000.00, per month.

10       12.    Plaintiffs allege that during the spring of 2008, the fourteen [14] lot residential plat

11   had obtained final approval from the City of Gig Harbor. Plaintiffs physically presented to Kroeger

12   at Kroeger's offices at FSBNW a five [5"] inch binder containing plaintiffs' assembled, cataloged,

13   and organized research data, cost and expense break down and itemization, plat maps, photographic

14   images of the project, and all supporting financial documentation.

15       13.    Plaintiffs had previously provided Kroeger and Mills with smaller packages months

16   earlier in 2007, and were told to proceed ahead. Plaintiff Steven J. Nikolich presented to Mills and

17   Kroeger a ½ inch colour brochure containing aerial photos, preliminary plat maps, and various data

18   and the mission statement for the entire development that included the 14 lots and the commercial

19   waterfront lots that plaintiffs had previously closed upon and had been paying interest on for the last

20   12 months. Both Mills and Kroeger instructed plaintiffs to proceed with paying $200,000.00, in

21   earnest money to the sellers, which plaintiffs in fact paid.

22       14.    Plaintiffs were reasonably assured by Kroeger's reaffirmation and confirmation of

23   Executive House/FSB's previously expressed support of the project by both Mills and Kroeger that

24   plaintiffs reasonably believed that FSB/Executive House would maintain its commitment to

25   plaintiffs to provide real estate financing to facilitate and further the project.

26       15.    Plaintiffs were assured by both Mills and Kroeger when plaintiffs submitted their

27   binder that Mills and Kroeger would immediately review the documentary materials.

28       16.    After nearly three [3] weeks plaintiffs physically appeared at Kroeger's office and

4        AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

1   specifically inquired about the status of Kroeger's review, telling Kroeger that plaintiffs' voice

2   messages left at Kroeger's office were not returned.

3       17.   Plaintiffs told Kroeger at this meeting that both Kroeger and Mills had assured

4   plaintiffs that FSB would continue to finance projects previously submitted to Executive House, that

5   plaintiffs were one of their best and loyal clients, and that plaintiffs had been working on this plat

6   for many years, and that predicated upon the reaffirmation and confirmation expressed by both Mills

7   and Kroeger, both prior to and at the time of the binder submission that both of them would finance

8   the project through FSB/Executive House, plaintiffs expended $200,000.00, in earnest money, and

9   closed upon the two [2] commercial water front lots that were part of the development project,

10  paying substantial interest expense monthly over one [1] year.

11      18.   Plaintiffs allege that in response to plaintiffs' statement to Kroeger, Kroger

12  specifically told plaintiffs that: "John didn't like that plat that much." Plaintiffs immediately replied:

13  "He [John Mills] never told me that and besides, John's left the company, you're the man in charge,

14  you liked the development." Kroeger simply responded that FSB/Executive House were no longer

15  interested in financing real estate development projects across the board.

16      19.   Kroeger also told plaintiffs that FSB/Executive House was allegedly working on long

17  term strategies  "for their best customers and that I [plaintiffs] was going to get all the help that I

18  needed."

19      20.   David Kroeger told Nikolich that FSBNW/Executive House could not and would not

20  modify any loans of any type.

21      21.   Plaintiffs allege that in late December, 2008, David Kroeger, verbally, via federal

22  interstate wires and/or federal mails, represented to plaintiffs that Kroeger, acting  upon  of

23  FSBNW/Executive House, had a proposal.  Kroeger represented  to  plaintiffs that plaintiffs could

24  make fifty percent [50%] payments upon the interest expense charges imposed upon the 14

25  properties comprising the project over the next few months.

26      22.   According  to the proposal, plaintiffs' effecting 50% payments of interest expense

27  charged upon those 14 properties would evidence good faith by plaintiffs and thereby  preclude

28  FSBNW/Executive House from reporting late payments by plaintiffs.  Plaintiffs told Kroeger that

1    plaintiffs were amenable to the proposal and agreed with the proposal's reasoning.  Based upon

2    Kroeger's proposal, plaintiffs on 29 December 2008, wrote and issued a check payable to

3    FSBNW/Executive House in the amount of $19,234.01, for 50% payment of the interest payment.

4        23.    Plaintiff Steven J. Nikolich then drove from plaintiffs' office to Kroeger's

5    FSBNW/Executive House offices at Renton, WA, and personally tendered the check, and left town

6    for two weeks.   While out of town, Kroeger telephoned Nikolich and told Nikolich that

7    FSBNW/Executive House would not adopt the proposal, voided the check, and returned the voided

8    check to Nikolich.

9        24.    Plaintiffs allege that in early 2009, plaintiffs renewed their efforts to contact and

10   speak with Kroeger regarding his matter; however, inasmuch as plaintiffs were experiencing serious

11   difficulties in locating Kroeger at FSBNW, plaintiff Steven J. Nikolich in January, 2009, called and

12   spoke with FSBNW president Victor Karpiak about Kroeger's prior proposal submission to plaintiffs

13   reasonably relied upon by submitting the check to FSBNW that Kroeger voided and returned.

14       25.    During the early spring, 2009, plaintiff Steven J. Nikolich scheduled a conference

15   with Kroeger at Kroeger's FSBNW office. Arriving at the conference, plaintiff was met by Jeff

16   Gregg, identifying himself as a FSBNW Customer Relations representative.

17       26.    On 4 May 2009, plaintiff Steven J. Nikolich met with Jeff Gregg at the FSBNW

18   offices  where  Gregg presented to plaintiff the alleged "Workout Plan," a written document

19   generated and authored by FSBNW's duly authorized corporate representatives, including Gregg.

20       27.    The written plan expressly  stated that: We [FSBNW] will grant you interest

21   only payments for the next 12 months." Gregg executed  the plan in the physical presence of

22   Nikolich who witnessed the act of signing the instrument by Gregg.

23       28.    Based upon the express representations, warranties, affirmations, and confirmations

24   both set forth within the FSBNW "*Workout Plan*" and also premised upon Gregg's oral

25   representations made to Nikolich at the time of the signing of the instrument, plaintiffs made the

26   June, 2009, interest only payment of $29,596.79, and made the July, 2009, interest only payment of

27   $29,596.79, both payments timely made, and by check.

28       29.    On or about 1 August 2009, plaintiffs were informed and learned that an insurance

6        AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

1   policy of plaintiffs was being canceled. Based upon plaintiffs' understanding and prior course of

2   dealing with FSBNW that the taxes and insurance would be paid and kept current by FSB.

3          30.    Plaintiffs made at least twelve [12] telephone calls to Gregg's office, leaving detailed

4   voice messages about the matter, warning of the potential adverse financial consequences that would

5   affect plaintiffs if the matter was not addressed and resolved promptly and expeditiously, requesting

6   an immediate reply call.  No reply call from Gregg was forth coming.

7          31.    Plaintiffs allege that during the  late summer and the early fall of 2009, plaintiffs

8   were engaged in continuous negotiations and discussions with two [2] separate potential purchasers

9   in plaintiffs' commercial real properties as well as pursuing negotiations with other potential

10   buyers/investors  of  other properties owned and operated by plaintiffs.

11          32.    On 8 October 2009, Jeff Gregg transmitted to plaintiffs, via electronic message,

12   electronic mailing, and/or other electronic dissemination device, an itemized list of all of plaintiffs'

13   commercial properties that reflected recently appraised values on all but four of those properties.

14   Gregg told Nikolich that FSBNW  would look at "short sales," which was the first time plaintiffs

15   ever heard the term "short sale."

16          33.    Plaintiff Steven J. Nikolich reviewed Gregg's itemized list of plaintiffs' commercial

17   properties and expressed both revulsion and shock at the represented  low values ascribed  to

18   plaintiffs' commercial properties, and immediately telephoned and spoke with Gregg voicing

19   Nikolich's abject displeasure.  Nikolich inquired  of Gregg: "Is this what you want me to list them

20   at?" Gregg replied: "I'm not supposed to give you this information."

21          34.    Plaintiffs allege that in late October, 2009/early  November, 2009, Jeff Gregg, via

22   federal interstate wires and/or federal mails, contacted plaintiff Steven J. Nikolich and told Nikolich

23   that FSBNW recently hired a new asset manager, James Preston, and that plaintiffs would work

24   directly with Preston to formulate a plan to address and resolve plaintiffs' serious issues.

25          35.    Plaintiff Steven J. Nikolich in turn commenced telephoning  Preston at the FSBNW

26   Renton, WA, corporate offices to schedule a conference.  During this time plaintiffs had no

27   agreement with FSBNW, and plaintiffs learned of larger commercial builders and developers not

28   making their  payments to FSBNW, many of these builders and developers  known by  plaintiffs.

36.     Plaintiffs were able to schedule a conference to commence at 9:00 a.m.,  7 December 2009, with FSB representatives James Preston, Jeff Gregg, and Roger Gainer at plaintiff Portfolio Investments, LLC, corporate offices on Lake Tapps, WA, with Steven J. Nikolich to review and discuss plaintiffs' proposals, to physically tour and walk through plaintiffs' commercial properties, and to review and consider written offers plaintiffs had previously received from potential purchasers interested in acquiring commercial  properties  from plaintiffs.

37.     The 7 December 2009, scheduled conference did not occur due to the refusal and/or failure of   with FSBNW representatives James Preston, Jeff Gregg, and Roger Gainer to attend. Plaintiffs received a voice message  from Gregg late afternoon that Preston was called away on an alleged "crisis" and inquired if the conference could be  reconvened for 9 December 2009, at the Portfolio Investments, LLC, corporate offices. Plaintiff Nikolich returned the call and left a voice message that the conference would be held at  9:00 a.m., on 9 December 2009.

38.      The 9 December 2009, scheduled conference did not occur due to the refusal and/or failure of   with FSBNW representatives James Preston, Jeff Gregg, and Roger Gainer to attend. Plaintiffs did not receive any  voice message  from Gregg, or any other FSB representative.  Plaintiff Nikolich returned the call and left a voice message that the  conference  would be held at  9:00 a.m., on 9 December 2009.  Nikolich similarly called John Mills on 10 December 2009,  and explained the recent series of events as rather disheartening, and Mills told Nikolich that Mills had confirmed that other commercial builders and commercial developers experienced sudden, inexplicable meeting cancellations by FSBNW.

39.     On Friday, 11 December 2009, plaintiff Nikolich  telephoned and spoke with David Soliem, president of Capstone Homes, also a FSBNW  client experiencing similar difficulties, and described the recent spate of "no shows" committed by FSB representatives James Preston, Jeff Gregg, and Roger Gainer, and that Preston allegedly had been called away to address an immediate crisis as the reason for the "no  show" on 7 December 2009.  Soliem told Nikolich: "Bingo. The crisis is probably me [Capstone Homes]. We just ran out of money."   Capstone Homes was one of the largest, if not the largest, client of FSB.

40.     On Monday, 14 December 2009, at 9:00 a.m., Nikolich met with Soliem at the

1   Capstone Homes corporate office to compare notes regarding FSB.  Soliem confirmed to Nikolich

2   that James Preston had in fact met with Soliem on 7 December 2009, during the  time that Nikolich

3   patiently  awaited  Preston, Gregg, and Gainer to meet with  plaintiffs as previously  confirmed and

4   scheduled.

5          41.    During this meeting  Soliem told  Nikolich  that Capstone Homes was on the

6   financial precipice of commercial collapse  if FSBNW did not facilitate a major financial structural

7   workout to immediately prevent Capstone   from defaulting upon approximately $60,000,000.00,

8   in outstanding commercial real property  projects.

9          42.    Plaintiffs allege that during the first week of January, 2010, plaintiffs received a

10  deluge of telephone calls from tenants of plaintiffs specifically informing plaintiffs that "Notices of

11  Default," executed and dated 30 December 2009, by FSB chief credit officer Robert Gagnier, were

12  conspicuously posted upon plaintiffs' commercial buildings. Plaintiffs immediately contacted Gregg

13  and expressed both outrage and incredulity, inquiring how could FSBNW allow this to occur when

14  Gregg assured Nikolich that Preston would convene a conference with Nikolich that very same

15  week. Nikolich  also told Gregg that at least nine [9] notices contained erroneous information, that

16  plaintiffs' tenants began acting standoffish, and two tenants told Nikolich that as a result of the

17  postings, they were no longer interested in acquiring the buildings they occupied.

18         43.    Plaintiffs allege that in the wake of the posting of the "Notices of Default" by

19  FSBNW, many tenants withheld rental payments plaintiffs.

20         44.    On *20 January 2010*, at 11:00 a.m., plaintiff Steven J. Nikolich convened a

21  conference  with  FSBNW  representatives James Preston, Jeff Gregg, and Roger Gainer at  the

22  FSBNW  Renton, WA, corporate offices. Nikolich also told these individuals how upset he was  that

23  FSB NW  posted the "Notices of Default" prior to this particular meeting, and the inexplicable,

24  inexcusable reasons why the previously scheduled meetings in early December, 2009, were not

25  attended.

26         45.    In reply, James Preston told  Steven J. Nikolich that FSBNW was intent upon

27  formulating a universal resolution of all of plaintiffs' commercial properties, and expressly stated

28  that Preston had formulated such a global resolution for discussion.  Preston told Nikolich that if

9       AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

1    plaintiffs turned over all of plaintiffs' commercial properties, FSBNW  would not pursue plaintiffs

2    for deficiency judgments.

3        46.    During the course of  this 20 January 2010, conference James Preston specifically

4    inquired of Steven J. Nikolich's ethnic affiliation and background, which Nikolich, who is of ***Slavic***

5    ethnic descent, patently offensive and irrelevant. A response followed, Nikolich feeling uneasy.

6        47.    On 25 January 2010, plaintiff Steven J. Nikolich was hospitalized after being

7    diagnosed with "Bells Palsy," a particular muscular debilitating  condition affecting speech and

8    motion. Nikolich duly notified FSBNW representatives of this development seriously affecting his

9    health.

10        48.    Plaintiffs allege that on or about *28 January 2010*, plaintiffs received an unsolicited

11    letter, shipped, transmitted, and sent 27 January 2010, via Federal Express– Priority Overnight, from

12    Susan Chang, Esq., John E. Cicero, II, Esq., and Tax  Attorneys, Inc. This Tax Attorneys, Inc., letter

13    was sent exactly one [1] week after plaintiff Steven J. Nikolich met with James Preston and Jeff

14    Gregg at the FSBNW corporate offices, on  20 January 2010.

15        49.    The unsolicited letter plaintiffs received from Tax Attorneys, Inc., undated, identified

16    John E. Cicero, II, Susan Chang, and Olga Rotstein as members of the law firm. Cicero's name also

17    includes an asterisk ["*"] that states "Practice Limited: Federal Taxation." The letter bears and

18    affirmatively evidences the signature of  John Cicero, II, Esq., thereupon and reads as follows:

19                             ***Providing Attorney Short Sale Negotiations***
      Re:    1.    ***Forgiveness of debt***

20                         On your Foreclosure action (without filing Bankruptcy)
              2.    ***Your CASH settlement from the Bank***

21                         (generally 1-2% of each current property value)
We use unique Litigation in Washington State to completely stop the Foreclosure action

22    against your Mortgage or Deed of Trust.  We can compel your underlying lien holders to
release all claims against you and **Forgive the entire balance  due  on  your  deficiency** –

23    ***without*** having to file bankruptcy.  Imagine your bank issuing you a "deficiency waiver" and
forgiving the unpaid balance owed forever. **No  other  real estate  broker or Attorney in**

24    **Washington has access to this system**.  We invite you to meet with us to discuss  your
foreclosure problems and how they can permanently be  resolved.

25    Our seasoned Attorneys have a unique advantage in negotiating directly with the Attorneys
at your lenders Legal Department to obtain the best possible result for you.

26    ***BEWARE*** of empty promises from bankers, real estate sales people, mortgage sales people
and mediators.  After  your  free  consultation with us, you will know  your real  options.

27                       Act now.  Your rights could be in jeopardy.
            Your appointment is free and our fees are paid by the bank.

28    Call today without any obligation at **(425) 462-2550.**

1    Ask for Christine Davis, Law Office Manger to schedule your confidential appointment.

          Very truly yours,

2          /s/John Cicero

          John E. Cicero, II

3 (emphasis in original)

4    50.  Plaintiff Steven J. Nikolich immediately read the undated letter from

5 Tax Attorneys, Inc., put the letter down, picked it up and re-read the letter, and then picked up the

6 telephone in the Portfolio Investments, LLC, corporate offices , and called and spoke with Susan

7 Chang, Esq. Nikolich specifically described plaintiffs' multi-faceted issues involving plaintiffs'

8 commercial properties with FSBNW to Chang, that Nikolich was engaged in current discussions

9 with FSBNW officers Preston, Gregg, and Gainer to achieve a universal resolution with FSBNW.

10 Chang assured Nikolich that Tax Attorneys, Inc., would be able to help plaintiffs to achieve that

11 universal resolution with FSB. Nikolich told Chang that he was recovering from Bells Palsy.

12    51.  On 31 March 2010, Plaintiffs Steven J. Nikolich and Marcia A. Nikolich, Danica

13 Nikolich, plaintiffs' daughter, and Steven J. Nikolich, managing member, Portfolio Investments,

14 LLC, met with Susan Chang, Esq., and John Cicero, II, Esq., at the Tax Attorneys, Inc., law firm's

15 Bellevue, WA, office. Justin Cicero, corporate officer, manager, and director of Metropolitan Realty

16 Group, also attended. Justin Cicero was introduced to plaintiffs as the son of John Cicero.

17    52.  During the course of the conference both Chang and Cicero spoke of the law firm's

18 so called "*unique*" exclusive system, which they referred to in the letter I received a few weeks

19 before from their law offices. Chang and Cicero represented to plaintiffs that the attorneys at Tax

20 Attorneys, Inc., possessed exclusive inside confidential information on several financial institutions,

21 including FSBNW, and that the law firm sent that unsolicited letter to plaintiffs because of their

22 "exclusive" access to such confidential information.

23    53.  Plaintiffs concluded the conference with the attorneys and left their offices. Justin

24 Cicero followed Marcia A. Nikolich and Danica Nikolich down the hall after Steven J. Nikolich

25 stopped in the rest room, telling the two individuals: "I don't think you understand. This won't cost

26 you anything."

27    54.  On subsequent occasions, in late April,2010/early May, 2010, Justin Cicero, acting

28 upon behalf of Metropolitan Realty Group, offered to list all of plaintiffs' commercial real

11   AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

1  properties through Cicero's Metropolitan Realty Group in order to facilitate plaintiffs' proposal to

2  FSB by having private investors submit written offers to purchase the outstanding balance of the

3  FSB real estate loans at a 50% discount. Cicero told plaintiff Steven J. Nikolich that by plaintiffs

4  listing all of their commercial real properties through Metropolitan, plaintiffs would be evidencing

5  good faith with FSBNW to successfully dispose of those real properties.  Cicero also told Nikolich

6  that this approach would necessarily strengthen Nikolich's hand in negotiations with FSB.

7        55.    Nikolich considered the approach reasonable at the time, though still labouring under

8  the affects of Bells Palsy, which Nikolich expressly stated to both Chang and Cicero that Nikolich

9  was continuing to experience the affects thereof.  During one particular conference during this period

10  between plaintiff Steven J. Nikolich and Susan Chang, Esq., at the law offices of Tax Attorneys,

11  Inc., Nikolich specifically inquired of Chang for detailed information about how these attorneys

12  would succeed in this regard.  Chang expressly responded to Nikolich stating: "*If I told you all that*

13  *was involved you would be quickly overwhelmed.*"

14        56.    Plaintiffs then resumed their discussions with James Preston and FSB about

15  plaintiffs' proposal to FSBNW  by having private investors submit written offers to purchase the

16  outstanding balance of the FSBNW real estate loans at a 50% discount. Plaintiffs were within a few

17  weeks of the posted auction date of 7 May 2010, and plaintiffs were informed by various investors

18  that they contacted the FSB and requested to speak directly with Preston, but that Preston did not

19  reply or respond to their inquiries.

20        57.    In May, 2010, Plaintiff Steven J. Nikolich exhibited serious concern  as a result of

21  being so informed by those investors that Nikolich immediately sent a certified letter/return receipt

22  requested to James Preston specifically informing Preston of the significance of this matter, the

23  imminent urgency to address these investors' inquiries, and the potential consequences plaintiffs

24  confronted in the event Preston and FSBNW failed or refused to negotiate.

25        58.    Plaintiffs allege that plaintiff  Steven J. Nikolich received a telephone call from

26  Preston  on 29 April, 2010, while plaintiff attended a cookout at the home of Vero Ward, attended

27  also by Rich Enfield. Nikolich told Preston, in the presence of Ward, that Nikolich's investors were

28  seeking assurances that the auctions previously noticed would be abated, continued, or stayed.

59.     Plaintiff Steven J. Nikolich received an immediate response from James Preston by Preston calling Nikolich and telling Nikolich that Preston was annoyed with Nikolich's letter, and reassured Nikolich that FSBNW would cooperate and speak with plaintiffs' investors, but that Preston did not want or desire any written documentation generated that would evidence the nature and status of such negotiations.

60.     Plaintiff Steven J. Nikolich forcefully accentuated and highly stressed the significant importance of Preston abating the auction dates in order for the investors to discuss the proposal with Preston and FSBNW because Susan Chang, Esq., John Cicero, II, Esq., of Tax Attorneys, Inc., and Justin Cicero, of Metropolitan Realty Group, were pressuring plaintiffs to file emergency Chapter 11 bankruptcy cases to automatically stay the auctions, that FSBNW was engaged in "game playing" with plaintiffs by giving plaintiffs the "run around," and that Metropolitan would list all of plaintiffs' commercial real properties.

61.     On 6 May 2010, plaintiffs listed on 4 May 2010, all of plaintiffs' commercial real properties with Metropolitan Realty Group, and on 6 May 2010, through Tax Attorneys, filed two [2] Chapter 11 petitions for relief in order to automatically stay the imminent auction sales scheduled for 7 May 2010.

62.     On 4 May 2010, plaintiffs appeared at the Tax Attorneys, Inc., Bellevue, WA, office to sign the listings; however, only Susan Chang, Esq., was present. Neither Justin Cicero or any representative of Metropolitan Realty Group was present. Chang presented to plaintiffs all 14 listings in blank on the sale prices, and Chang demanded that plaintiffs execute the listings immediately. Plaintiffs expressly told Chang of plaintiffs' genuine uneasiness and discomfort about being demanded to sign listings in blank, that Chang immediately call Justin Cicero, the broker, and demand Cicero's immediate presence. Cicero, present on speaker phone, told plaintiffs he could make it to the law offices. .

63.     Plaintiffs executed the blank listings in the presence of Susan Chang, Esq., of Tax Attorneys, Inc., their attorneys of record in the federal bankruptcy court filings. Chang told plaintiffs that Chang was acting as a real estate agent in this particular moment, which plaintiffs found highly suspect and questionable. Plaintiffs, reeling from the ever increasing pressure and stress

1    of having dealt with FSBNW, Preston, Metropolitan Realty, Justin Cicero, Chang, John Cicero, and

2    Tax Attorneys,   acted on good faith and reposed trust and confidence in their attorneys for

3    constructive, beneficial advice and counsel.

4         64.    At 5:23 p.m., 6 May 2011, plaintiffs received a telephone call from James Preston

5    on Marcia A. Nikolich's speaker cell phone in her Prius.  Preston told Steven J. Nikolich: "Hi Steve.

6    This is Jim Preston.  We got your filing [two (2) bankruptcy petition filings] this afternoon. You

7    know, you didn't have to file, We were going to extend the auction date." Nikolich replied: "Jim,

8    I was concerned that I didn't have anything in writing that says you would extend the auction date."

9    Preston responded: "Well, I told you we would.  At any rate we are still interested in the deal. We

10   [FSB] are real close to your 50% offer of the value of the loans." Nikolich replied: "You know, Jim,

11   now you are going to have to go through my attorneys, Tax Attorneys, Inc." Preston commented:

12   "Have them call me." Nikolich said: "I will have John Cicero or Susan Chang give you a call."

13   Preston stated: " I'll be expecting their call." The  conversation concluded at that point.

14        65.    Plaintiffs then immediately telephoned  John  Cicero, II, Esq., and left a voice

15   message that James Preston had just called and spoken with plaintiffs about FSBNW consummating

16   a universal resolution at 50% of loan value to resolve plaintiffs' financial issues with FSBNW.

17   Cicero immediately returned the call to plaintiffs, stating that "Jim Preston shouldn't be calling you.

18   That's a $10,000.00 fine." Steven J. Nikolich replied: "Well, Jim certainly seems anxious to make

19   a deal.  We need to get back with him immediately." Cicero responded: "Let's give him a few days

20   to sit and we'll ask for Jim to put something in writing." Plaintiffs voiced incredulity at Cicero's

21   statement. Plaintiffs wanted Tax Attorneys to move expeditiously, essentially to "strike while the

22   iron was hot."

23        66.    After a week since that 6 May 2010, teleconference call with both Preston  and

24   Cicero, plaintiffs called and spoke with Susan Chang, Esq., and inquired  when the law firm called

25   and spoke with Preston about the matter. Chang told Steven J. Nikolich: "Let's give them a couple

26   of weeks." Nikolich replied: "I think we should strike while the iron's hot. Time is of the essence."

27   Chang did not respond to Nikolich's  repeated question, and Nikolich was at a loss for words about

28   the conduct of plaintiffs' attorney expressing such a cavalier,  matter-of-fact, nonchalant response

68.     Shortly afterwards, Preston called plaintiffs and left numerous voice messages stating that plaintiffs' attorneys  never contacted, called, or arranged to meet with Preston and  FSBNW.

69.     Subsequent to the 6 May 2010, Chapter 11 bankruptcy petition filings, Tax Attorneys, Inc., Susan Chang, Esq., John Cicero, I, Esq., and other attorneys at that law firm, were unresponsive to consistent questions and inquiries posited by the  plaintiffs relative to the attorneys' approach to negotiate with FSB to achieve the universal resolution of the financial matter previously presented and proposed to James Preston at FSBNW.

70.     Plaintiffs allege that on 18 June 2010,  plaintiff Portfolio Investments, Inc., by and through  managing member plaintiff Steven J. Nikolich, both mailed a letter addressed to John Cicero, II, Esq.,  and personally hand delivered a copy  of that  letter dated 18 June 2010, addressed to John Cicero, II, Esq., to Susan  Chang, Esq., Justin Cicero, corporate manager of Metropolitan Realty Group, that specifically expresses plaintiffs' serious issues about Tax Attorneys' lack of providing effective legal representation.

71.     Plaintiffs allege that neither Susan Chang, Esq.,  John Cicero, II, Esq., or any other attorneys at Tax Attorneys, Inc., ever replied, in any fashion or form, to plaintiffs' 18 June 2010, letter and John Cicero, II, Esq., never contacted or met with plaintiffs again.

72.     Plaintiffs allege that during all times material herein plaintiffs consistently and relentlessly advised and informed Tax Attorneys, Inc., Chang, Cicero, and other attorneys at that law firm that plaintiffs' investors continued to express their interest in plaintiffs' achieving a universal resolution of the matter with FSB.

73.     Plaintiffs allege that during all times material herein that Tax Attorneys, Inc., Susan Chang, Esq.,  John Cicero, II, Esq.,  and other attorneys at that law firm represented Metropolitan Realty Group, and Justin Cicero simultaneously when representing plaintiffs' interests.  Plaintiffs allege that at no time did Tax Attorneys, Inc., Chang, or Cicero disclose this fact to plaintiffs, and at no time did Chang, Cicero, or Tax Attorneys, Inc., ever disclose the fact that John Cicero was not admitted to practice law in the State of Washington.

74.     Plaintiffs allege that plaintiffs were so expressly informed by Tax Attorneys, Inc., Chang, and Cicero, that the alleged "secret" that Tax Attorneys, Inc., Susan Chang, Esq., John

1   Cicero, II, Esq., Metropolitan Realty Group, and Justin Cicero vaguely alluded to during conferences

2   with plaintiffs as to the law firm's unique ability to effectively negotiate with financial lenders such

3   as FSB was in fact  the presence  of  a pre-existing relationship established and promoted  between

4   an undisclosed "*confidential   inside*" person  at FSBNW, and Tax Attorneys, Inc., Susan Chang,

5   Esq.,  John Cicero, II, Esq.,  Metropolitan Realty Group, and Justin Cicero.

6          75.    Plaintiffs subsequently terminated the services of Tax Attorneys, Inc., Susan Chang,

7   John Cicero, Metropolitan Realty Group, and Justin Cicero on 20 October 2010, after concluding

8   that plaintiffs' attorneys were incapable, lacked experience,  and unwilling to advance and promote

9   plaintiffs' interests to achieve the universal resolution with FSBNW plaintiffs sought so urgently and

10  decisively to obtain.

11         76.    Plaintiffs  allege that each of  the following configurations, for purposes of plaintiffs'

12  RICO §1962(c) claims for relief,  constitute  a RICO "enterprise," as that term is defined pursuant

13  to RICO §1961(4):

14  A.    ***RICO   Enterprise No. 1:*** First Savings Bank Northwest and Executive House, Inc.,

15         constitutes a RICO  enterprise, organized and maintained by  and  through a consensual

16         hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or

17         representatives that formulate and implement policies relative to the  promoting, soliciting,

18         advancing and/or otherwise  operating a business organization  for  the  purpose  of  the

19         facilitating, furthering, and promoting commercial  mortgage lending services, commercial

20         mortgage  financing  services,  commercial  mortgage  consulting,  commercial  financing

21         services,  and  financial  investment  planing  and  consulting,  both  domestically  and

22         internationally.

23  B.    ***RICO   Enterprise No. 2:*** First Savings Bank Northwest, Executive  House, Inc., First

24         Financial Diversified Corporation,  and First Financial Northwest, Inc., constitutes a RICO

25         enterprise, organized and maintained by  and  through a consensual  hierarchy of partners,

26         managers, directors, officers, supervisors, agents, deputies, and/or  representatives that

27         formulate and implement policies relative to the  promoting, soliciting, advancing and/or

28         otherwise operating a business organization for the purpose of the facilitating, furthering, and

1   promoting commercial mortgage lending services, commercial mortgage financing services,

2   commercial mortgage consulting, commercial financing services, and financial investment

3   planing and consulting, both domestically and internationally.

4   C.   ***RICO Enterprise No. 3:***. Tax Attorneys, Inc., constitutes a RICO enterprise, organized and

5   maintained by and through a consensual hierarchy of partners, managers, directors,

6   officers, supervisors, agents, deputies, and/or representatives that formulate and implement

7   policies relative to the provision of promoting the practice of law within the state of

8   Washington, maintaining its principal offices within the City of Bellevue, County of King,

9   State of Washington. The law firm specializes in advising and counseling persons upon

10  real estate development, real estate construction, commercial real estate financing, both

11  domestically and internationally.

12  D.   ***RICO Enterprise No. 4:***. Metropolitan Realty Group, constitutes a RICO enterprise,

13  organized and maintained by and through a consensual hierarchy of partners, managers,

14  directors, officers, supervisors, agents, deputies, and/or representatives that formulate and

15  implement policies relative to the promoting, soliciting, advancing and/or otherwise

16  operating a business organization for the purpose of the facilitating, furthering, and

17  promoting real estate agent and real estate brokerage services, commercial and residential

18  real estate development and construction, commercial and residential real estate business,

19  commercial financing services, and financial investment planing and consulting, both

20  domestically and internationally..

21  77.   Plaintiffs allege that in conducting the business and affairs of the RICO

22  enterprises, and in committing the acts, omissions, misrepresentations, and breaches referred to

23  herein between December, 2008, and continuing up through and including the initiation of these

24  proceedings, RICO defendants engaged in a RICO pattern of racketeering activity in contravention

25  of RICO §1962(c). Plaintiffs allege that defendants' use of the federal mails and the federal interstate

26  wires in this regard was reasonably foreseeable, and, as such, constituted contraventions of 18

27  U.S.C. §§ 1341, 1343, and 1346.

28  78.   Plaintiffs allege that above activities and/or conduct engaged in by RICO

17   AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

defendants constitute a "pattern of racketeering activity," as that term is defined pursuant to RICO §1961(5). Plaintiffs allege that there exists similarly situated victims that experienced comparable losses by and through the activities engaged herein by RICO defendants, including, but not restricted to:

♦   Vero P. Ward and Kari L. Ward, both of whom filed for federal bankruptcy relief under Chapter 7, *In re: Vero P. Ward and Kari L. Ward*, U.S. B.C. W.D. Wa., Case No.: 10-25020-MLB, filed 12/16/2010

♦   Basic Ventures, Inc., Joseph M. Pruss, and Jacki S. Pruss, in September, 2011,  Superior Court for the State of Washington for the County of King, *First Savings Bank Northwest, v. Basic Ventures, Inc., et.al.*, Case No.: 11-2-27037-8SEA, for monies due on promissory notes and commercial guaranties, seeking both  deficiency judgment relief and damages. Defendants therein counter claimed for damages arising from breach of oral agreement and for equitable estoppel.

♦   Lily Point LLC and Fairway ML 1 initiated action on 23 September 2010, against First Savings Bank Northwest for breach of contractual agreement, equitable estoppel, and for unjust enrichment, *Lily Point LLC and Fairway ML 1, v. First Savings Bank Northwest*, Superior Court for the State of Washington for the County of Whatcom, Case No.: 10-2-02368 9,  arising from a dispute wherein FSBNW  warranted  and confirmed to plaintiffs therein that FSBNW would  cooperate and perform in good faith accordingly relative to the disposition of a lien upon certain real property, when in fact FSBNW reneged, resulting in the loss of the real property at auction sale because of FSBNW's bad faith.

79.   Plaintiffs allege that John Mills, and  Judith Mills, by and through Greenwood Capital-1, LLC, by virtue of John Mills' prior employment as a corporate officer, director, and/or manager of Executive House, Inc., and FSBNW, actively pursued acquiring distressed properties previously financed by Executive House, Inc., and FSBNW, specifically, The Taylor Court, closing date 11 November 2010, sales price $895,000.00. FSBNW  subsequently initiated a civil action against  Basic Ventures, Inc., Joseph M. Pruss, and Jacki S. Pruss, in September, 2011, regarding this property,  Superior Court for the State of Washington for the County of King, *First Savings*

*Bank Northwest, v. Basic Ventures, Inc., et.al.*, Case No.: 11-2-27037-8SEA.

80.    Plaintiffs are  entitled to recover damages according to offer of proof at time of trial.

### FIRST  CLAIM  FOR  RELIEF

[For Commission of  Primary Contravention of RICO Section 1962(c)]

[Against FSBNW, Executive House, Kroeger, Preston, Gregg, Tax Attorneys, Inc., Susan Chang,

and John E. Cicero, II,  Only ]

81.    For  Plaintiffs' First Claim for Relief, plaintiffs reallege and incorporate Paragraphs 1 through 80.

82.    Plaintiffs allege that RICO defendants engaged in the aforementioned activities, with the intent to harm  plaintiffs' interest  in business and/or property in contravention of RICO §1962(c). Plaintiffs allege that the afore described activities constitute conduct engaged in by defendants to deprive plaintiffs of their  interest in business and/or property, by and through commission of  federal mail fraud and   federal wire fraud,  and are therefore indictable as "racketeering activity," as that term is defined  pursuant to Title 18 United States Code §1961(1)(B).

83.    Plaintiffs allege that the course of conduct engaged in by said defendants constitute both continuity  and  relatedness of the racketeering activity, thereby constituting a "pattern of racketeering activity, as that term is defined pursuant to Title 18 United States Code §1961(5).

84.    Plaintiffs expressly incorporate herein by reference the RICO enterprises specifically identified within in ¶ 76.

85.    Plaintiffs are  entitled to recover, pursuant to RICO  §1964(c), treble damages.

### SECOND  CLAIM FOR  RELIEF

[For RICO Aiding and Abetting Primary Contravention of RICO Section 1962(c)]

[Against FSBNW, Executive House,  Kroeger, Preston, Gregg, Tax Attorneys, Inc., Susan

Chang, and John E. Cicero, II, Only]

86.    For  Plaintiffs'  Second   Claim for Relief, plaintiffs reallege  and incorporate Paragraphs 1 through 80, and each and every claim for relief asserted pursuant to RICO.

87.    Plaintiffs allege that defendants  were knowledgeable and  aware of the commission of the primary RICO contraventions committed,   and   that said defendant s

19      AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

substantially assisted   in   the commission  of  the  primary RICO contraventions by defendants, thereby deriving a monetary  benefit as a result to the detriment of plaintiffs.

88.     Plaintiffs are  entitled to recover, pursuant to RICO  §1964(c), treble damages.

THIRD  CLAIM  FOR  RELIEF

[For  Contravention  of  RICO Section 1962(c)][Respondeat Superior\Derivative Liability]

[Against  First Financial Northwest, Inc., Victor Karpiak, FSBNW, and Executive House, Inc.,

Only]

89.     For  Plaintiffs'   Third  Claim for Relief,  plaintiffs reallege  and incorporate Paragraph 1 through 80, and each and every claim for relief asserted pursuant to RICO .

90.     Plaintiffs allege that defendants named herein  exercised  control,  management, and/or direction of the various persons and individuals, to wit, Mills, Kroeger, Gregg, and  Preston, relative  to the complained of  fraudulent and felonious activities, with the intent to harm  plaintiffs in plaintiffs'  business and/or  property  interests.

91.     Plaintiffs allege that the commission of the  afore described fraudulent and criminally felonious activities  by said individuals  employed by  or  associated with defendants named herein arose within the course and scope of the employ and/or agency therewith,  and  therefore defendants named herein are  vicariously and derivatively  liable   for contravening RICO  Section 1962(c).

92.     Plaintiffs further allege that defendants named herein  ratified, authorized, acquiesced, and/or consented to the  wrongful conduct  of  certain  persons and  individuals that proximately  caused  the  injuries sustained by plaintiffs to plaintiffs' interests in business and/or property.

93.     Plaintiffs are  entitled  to recover, pursuant to RICO  §1964(c), treble damages.

FOURTH CLAIM  FOR  RELIEF

[For  Contravention  of  RICO Section 1962(c)][Respondeat Superior\Derivative Liability]

[Against Tax Attorneys, Inc., Only]

94.     For  Plaintiffs'   Fourth  Claim for Relief,  plaintiffs reallege  and incorporate Paragraph 1 through 80, and each and every claim for relief asserted pursuant to RICO.

95.     Plaintiffs allege that Tax Attorneys, Inc., exercised  control,  management, and/or

1   direction of the various persons and individuals, to wit, Susan Chang, Esq., John E. Cicero, II, Esq.,

2   and other attorneys, counselors, lawyers, barristers, and/or solicitors relative to the complained

3   of fraudulent and felonious activities, with the intent to harm plaintiffs in plaintiffs' business

4   and/or property interests.

5        96.    Plaintiffs allege that the commission of the afore described fraudulent and criminally

6   felonious activities by said individuals employed by or associated with Tax Attorneys, Inc.,

7   arose within the course and scope of the employ and/or agency with Tax Attorneys, Inc., and

8   therefore Tax Attorneys, Inc., is vicariously and derivatively liable for contravening RICO

9   Section 1962(c).

10       97.    Plaintiffs further allege that Tax Attorneys, Inc., ratified, authorized, acquiesced,

11  and/or consented to the wrongful conduct of certain persons and individuals that proximately

12  caused the injuries sustained by plaintiffs to plaintiffs' interests in business and/or property.

13       98.    Plaintiffs are entitled to recover, pursuant to RICO §1964(c), treble damages.

14                       FIFTH  CLAIM  FOR  RELIEF

15  [For RICO Aiding and Abetting a RICO § 1962(d) Conspiracy Contravention of RICO §1962(c)]

16     [Against FSBNW, Executive House, Karpiak, Kroeger, Preston, Gregg, Tax Attorneys, Inc.,

17                    Susan Chang, and John E. Cicero, II, Only]

18       99.    For Plaintiffs' Fifth Claim for Relief, plaintiffs reallege and incorporate Paragraphs

19  1 through 80, and each and every claim for relief asserted pursuant to RICO.

20       100.   Plaintiffs allege that defendants employed the federal mails and/or

21  federal interstate wires, as well as engaged in racketeering activity as alleged herein, to aid and abet

22  the primary RICO § 1962(c) contraventions committed by defendants.

23       101.   Plaintiffs allege that the defendants' conduct constituted aiding and abetting a RICO

24  §1962(d) conspiracy inasmuch as defendants were:

25  ♦    associated with a criminal venture as alleged herein;

26  ♦    that the defendants participated in the criminal venture as something the defendants wished

27       to bring about; and,

28  ♦    that the defendants sought by their actions to make it succeed.

21     AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

102.    Plaintiffs allege that defendants are conspiratorially liable under application of the *Pinkerton* Doctrine [*Pinkerton, v. United States*, 328 U.S. 640 (1946) and *Salinas, v. United States*, 522 U.S. 52 (1997)] for the substantive RICO Section 1962©) contraventions committed by defendant inasmuch as:

A.    Defendants engaged in the fraudulent activities that constitute the RICO §1961(5) pattern of racketeering activity;

B.    Defendants are members of the RICO §1962(d) conspiracy designed and intended to contravene RICO § 1962(c);

C.    Defendants engaged in activities in furtherance of advancing and promoting the RICO §1962(d) conspiracy designed and intended to contravene RICO § 1962(c);

D.    Defendants are members of the RICO §1962(d) conspiracy at and during the time frame the fraudulent activities were committed that constitute the RICO §1961(5) pattern of racketeering activity; and,

E.    The offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

103.    Plaintiffs are entitled to recover, pursuant to RICO §1964(c), treble damages.

### SIXTH CLAIM FOR RELIEF

[For Commission of RICO §1962(d) Contravention of RICO §1962(c)]

[Against FSBNW, Executive House, Karpiak, Mills, Kroeger, Preston, Gregg, Karpiak, Tax Attorneys, Inc., Susan Chang, and John E. Cicero, II, Only]

104.    For Plaintiffs' Sixth Claim for Relief, plaintiffs reallege and incorporate Paragraphs 1 through 80, and each and every claim for relief asserted pursuant to RICO.

105.    Plaintiffs allege that defendants' actions are deemed to constitute mediate causation resulting with the exertion of some causal effect upon other defendants' conduct by virtue of the affiliating with one another for criminal purposes. Plaintiffs allege that such criminal affiliation constitutes a voluntary act committed with a culpable *mens rea* that causes a societal harm and concomitant social harm.

106.    Plaintiffs allege that defendants are conspiratorially liable under application of the

22    AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

1    *Pinkerton* Doctrine [***Pinkerton, v. United States***, 328 U.S. 640 (1946)  and  ***Salinas, v. United***

2    ***States***, 522 U.S. 52 (1997)] for the substantive RICO Section 1962(c) contraventions committed by

3    defendant inasmuch as:

4    A.    Defendants  engaged in the fraudulent activities that constitute the RICO §1961(5) pattern

5          of racketeering activity;

6    B.    Defendants are   members of the RICO §1962(d) conspiracy designed and intended  to

7          contravene RICO § 1962(c);

8    C.    Defendants engaged in activities in furtherance of advancing and promoting the RICO

9          §1962(d) conspiracy designed and intended  to  contravene RICO § 1962(c);

10   D.    Defendants are  members of the RICO §1962(d) conspiracy at and during the time frame the

11         fraudulent  activities  were  committed  that  constitute  the  RICO   §1961(5)  pattern  of

12         racketeering activity; and,

13   E.    The offense fell within the scope of the unlawful agreement and could reasonably have been

14         foreseen to be a necessary or natural consequence of the unlawful  agreement.

15         107.   Plaintiffs are  entitled to recover, pursuant to RICO § 1964(c), treble damages.

16                          SEVENTH  CLAIM  FOR  RELIEF

17              [For Commission of RICO §1962(d) Contravention  of  RICO § 1962(c)]

18              RE: RICO §1962(d) Conspiracy to Commit RICO Aiding and Abetting

19   [Against FSBNW, Executive House, Karpiak, Mills, Kroeger, Preston, Gregg, Karpiak, Tax

20                   Attorneys, Inc., Susan Chang, and  John E. Cicero, II, Only]

21         108.   For Plaintiffs'  Seventh  Claim  for  Relief,  plaintiffs reallege and incorporate herein

22   Paragraphs 1  through 80, and each and every claim for relief asserted pursuant to RICO.

23         109.   Plaintiffs allege that defendants' actions are deemed to constitute mediate causation

24   resulting with the exertion of some  causal effect upon other defendants' conduct by virtue of the

25   affiliating with one another for criminal purposes.  Plaintiffs allege that such criminal affiliation

26   constitutes a voluntary act committed with a culpable ***mens rea*** that causes a societal harm and

27   concomitant social harm.

28         110.   Plaintiffs allege that defendants are  conspiratorially liable under application of the

23    AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

*Pinkerton* Doctrine [*Pinkerton, v. United States*, 328 U.S. 640 (1946) and *Salinas, v. United States*, 522 U.S. 52 (1997)] for the substantive RICO Section 1962(c) contraventions committed by defendants inasmuch as:

A.   Defendants  engaged in the fraudulent activities that constitute the RICO §1961(5) pattern of racketeering activity;

B.   Defendants are  members of the RICO §1962(d) conspiracy designed and intended  to contravene RICO § 1962(c);

C.   Defendants engaged in activities in furtherance of advancing and promoting the RICO §1962(d) conspiracy designed and intended  to  contravene RICO § 1962(c);

D.   Defendants are  members of the RICO §1962(d) conspiracy at and during the time frame the fraudulent activities were committed that constitute the RICO  §1961(5) pattern of racketeering activity; and,

E.   The offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful  agreement.

111.   Plaintiffs are  entitled to recover, pursuant to RICO  §1964(c), treble damages.

EIGHTH  CLAIM  FOR  RELIEF

[For RICO §1962  Contravention  of  RICO §1962(c)]

[RE: RICO §1962(d)\Pinkerton Doctrine] re: Intra-Corporate Affiliate Conspiracy

[Against  First Savings Bank Northwest, First Financial Diversified Corporation, First Financial Northwest, Inc., and Executive House, Only]

112.   Plaintiffs, for an Eighth Claim for Relief, reallege  and incorporate herein Paragraphs 1  through 80, and incorporates each and every claim for relief advanced under RICO.

113.   Plaintiffs allege that commencing in December, 2008, and at all times material herein continuing thereafter, RICO commonly controlled corporate affiliated  defendants  mutually agreed to engage in the aforementioned racketeering activities and/or wrongful conduct giving rise to the RICO § 1962(c)  contraventions.

114.   Plaintiffs furthermore allege that said defendants developed, formulated, designed, implemented, and executed a corporate policy specifically intended to apply  corporate financial

1  infusion, grant construction/mortgage loan repayment extensions or comparable modification relief,

2  and managerial expertise and support to FSBNW clientele, considered "too big to fail," confronted

3  with imminent loss of real property projects financed by and through FSBNW, and erecting

4  superficial, opaque, vaguely amorphous and/or irrationally unsubstantiated excuses for refusing the

5  application of such resources to plaintiff and similarly situated victims considered "too insignificant

6  to save" from foreclosure and/or auction.

7         115.   Plaintiffs allege that said RICO defendants mutually agreed to affirmatively conceal

8  from plaintiffs the facts giving rise to defendants' "preferential corporate policy of saving 'best

9  customer' clientele" that produced and proximately caused plaintiffs' injuries to plaintiffs' interests

10  in business or property.

11        116.   Plaintiffs allege that defendants' actions are deemed to constitute mediate causation

12  resulting with the exertion of some causal effect upon other defendants' conduct by virtue of the

13  affiliating with one another for criminal purposes.  Plaintiffs allege that such criminal affiliation

14  constitutes a voluntary act committed with a culpable *mens rea* that causes a societal harm and

15  concomitant social harm.

16        117.   Plaintiffs allege that RICO defendants are conspiratorially liable under application

17  of the *Pinkerton* Doctrine [*Pinkerton, v. United States*, 328 U.S. 640 (1946) and *Salinas, v.*

18  *United States*, 522 U.S. 52 (1997)] for the substantive RICO Section 1962(c) primary

19  contraventions committed by defendants inasmuch as:

20  A.    Defendants engaged in the fraudulent activities that constitute the RICO §1961(5) pattern

21        of racketeering activity;

22  B.    Defendants are members of the RICO §1962(d) conspiracy designed and intended to

23        contravene RICO Sections 1962(c);

24  C.    Defendants engaged in activities in furtherance of advancing and promoting the RICO

25        §1962(d) conspiracy designed and intended to contravene RICO Section 1962(c);

26  D.    Defendants are members of the RICO §1962(d) conspiracy at and during the time frame the

27        fraudulent activities were committed that constitute the RICO §1961(5) pattern of

28        racketeering activity; and,

25     AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

E.      The offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful  agreement.

118.    Plaintiffs are  entitled to recover, pursuant to RICO §1964(c), treble damages.

NINTH CLAIM FOR RELIEF

[For Commission of Professional Negligence RE: Legal Malpractice]

[Against Tax Attorneys, Inc., Susan Chang, and  John E. Cicero, II, Only]

119.    Plaintiffs, for their Ninth Claim for Relief, reallege and incorporate herein by reference Paragraphs 48 to 75.

120.    Plaintiffs allege that during all material times herein, said attorneys owed plaintiffs a duty of care, a duty of loyalty, and a duty of protecting, advancing, and  preserving the interests and rights of plaintiffs.

121.    Plaintiffs allege that as a direct and proximate cause of the breach of the attorney-client relationship, plaintiffs sustained injuries to their interests in business and/or property, and are entitled to recover compensatory damages according to offer of proof at time of trial, including an award of attorneys' fees, costs, and expenses incurred herein.

TENTH CLAIM FOR RELIEF

[For Commission of Primary, Aiding and Abetting, and Respondeat Superior Liability RE:

Contravention of KKK §§1981-1982 of  the Ku Klux Klan Act of 1871]["KKK"]

[Against FSBNW and Preston, Only]

122.    Plaintiffs, for their Tenth  Claim for Relief, reallege and incorporate herein by reference Paragraph 1 through 80.

123.    Plaintiff Steven J. Nikolich, a  member of  a  protected  class  of  persons  of  racial and ethnic affiliation as a person of Serbian descent, specifically  alleges that FSBNW and James Preston specifically formulated, designed, implemented, and executed a scheme to deny plaintiffs their right to receive the rendition of  honest services as alleged herein relative to plaintiffs' seeking the bank's   assistance   for  monetary  infusions  and  related  relief  as  to  plaintiffs  outstanding commercial  and   residential real property mortgage/construction contract loans, predicated upon plaintiff's Serbian (*Slavic*) ethnicity.

124.    Plaintiffs allege that on 20 January 2010, during the course of a conference with FSBNW officers and representatives  James  Preston,  Jeff Gregg, and Roger Gainer at FSBNW's corporate offices in Renton, WA,  convened  for  the  express  purpose   of plaintiffs seeking FSBNW's financial infusion and  cooperation  regarding  plaintiffs' outstanding construction and residential real property  mortgage construction   contract  loans,  Preston  inquired of Steven J. Nikolich about the derivation of  plaintiff's last  name "Nikolich."  Plaintiff, considering the nature of the inquiry both unusual and strange, and not having any material relevancy to the purpose of the conference, explained that  plaintiff's paternal grandparents came to the United States of America from Serbia, which was part of the former Yugoslavia, via Ellis Island, New York.  Preston told plaintiff:

♦    that Preston would never have made the loans that John Mills made through Executive House;

♦    that Preston did not care about plaintiff's commercial real property projects;

♦    that Preston did not care about plaintiff's efforts to achieve assistance and support from FSBNW regarding plaintiffs' financial status pertaining to plaintiffs' commercial real property projects; and,

♦    that Preston would accept plaintiffs' relinquishment of all of plaintiffs' commercial real properties for liquidation purposes in exchange for plaintiffs' not to be subject to  purported deficiency judgments.

125.    Plaintiffs allege  that the inquiry by Preston served as a alleged justification to refuse and  deny plaintiffs' right to rendition of honest services of  immediate relief under the various real estate mortgage and construction contracts from FSBNW to avoid foreclosure and auction sales of plaintiffs' real property interests.

126.    Preston had  told plaintiff that FSBNW would assist the bank's allegedly "best customers," though Preston never disclosed to or discussed with plaintiff the bank's criteria employed to determine eligibility as a member qualified to be one of the bank's "best customers." During the 20 January 2010, meeting Preston expressly  told  plaintiff that Preston and FSBNW did not consider plaintiff a "best customer."

27    AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

127.    Plaintiffs allege that the alleged "best customer" characterization was formulated, implemented, and applied by and  through a corporate  policy established by First Savings Bank Northwest, First Financial Diversified Corporation, First Financial Northwest, Inc., Executive House,  James Preston, and other corporate affiliated directors and officers unknown to plaintiffs..

128.    Plaintiffs allege that the alleged "best customer" category is vague, capricious, arbitrary,  ambiguous, and amorphous, which is susceptible by  FSBNW deciding  to intentionally discriminate against   plaintiff  by reason of the Slavic origin of plaintiff's ethnicity  and  accord preferential treatment and consideration to FSBNW clientele who were **_not_** of Slavic origin and whose real property projects would receive FSBNW financial infusion, banking resources, and any other form of banking assistance to prevent foreclosure and/or auction of their real properties. Plaintiffs know for a fact that FSBNW  provided financial assistance and related construction loan/mortgage loan repayment relief or a "mortgage loan repayment moratorium," to the following FSBNW clientele by example, and not by restriction:

♦       FSBNW client Capstone Homes, Inc., whose   principal  owner David Soliem,  president, is  **_not_** of Slavic descent, obtained relief necessary to prevent a loss of approximately $60,000,000.00, in outstanding commercial real property projects that if default occurred, FSBNW would incur substantial monetary losses;

♦       FSBNW client New  Homes, LLC,  whose   principal owner Scott Haas is **_not_** of Slavic descent,  obtained relief necessary to prevent a loss of approximately  $31,000,000.00, in outstanding commercial real property projects that if default occurred, FSBNW would incur substantial monetary losses; and,

♦       FSBNW client Basic Ventures, Inc., whose principal owners, Joe Pruss and Jacki Pruss, are **_not_** of Slavic descent,   obtained relief necessary to prevent a loss of approximately $20,000,000.00, in outstanding commercial real property projects that if default occurred, FSBNW would incur substantial monetary losses

and that, in the corporate  business opinion of James Preston, were only a few of the allegedly  "best customers" that warranted FSBNW's time and resources  to the fact that those particular clients were "too big to fail."  All had originally obtained  their financing through Mills and Executive House.

129     Plaintiffs allege that as a proximate and/or direct cause of defendants' ethnically motivated animus, said defendants unlawfully discriminated against plaintiffs. Plaintiffs allege that defendants' conduct described herein above constituted contravention of KKK §§ 1981-1982.

130.     Plaintiffs allege that plaintiffs are entitled to recovery of compensatory damages according to offer of proof at time of trial. Plaintiffs are entitled to recover attorneys' fees, expenses, and costs pursuant to Section 1988 [Title 42 U.S.C. § 1988].

ELEVENTH CLAIM FOR RELIEF

[For Commission of Conspiratorial Contravention of KKK §§ 1981– 1982 of the Ku Klux Klan Act of 1871]["KKK"][RE: KKK §§ 1981-1982]

[Against First Savings Bank Northwest, First Financial Diversified Corporation, First Financial Northwest, Inc., Executive House, and James Preston, Only]

131.     Plaintiffs, for their Eleventh Claim for Relief, reallege and incorporate herein by reference Paragraphs 1 through 80, and the Tenth Claim for Relief.

132.     Plaintiffs allege that commencing in January, 2010, and continuing at all times material herein, defendants named herein mutually agreed to engage in the aforementioned intentional discriminatory practices giving rise to the KKK §§ 1981-1982 contraventions, that the objective of that mutual agreement was to destroy plaintiffs' interests in business and/or property, and that such conspiratorial conduct contravenes KKK §§ 1981-1982.

133.     Plaintiffs furthermore allege that such corporate policy was reflective and evidentiary of defendants' position towards plaintiffs inasmuch as said defendants preferred to apply corporate banking financial resources, banking efforts, and banking financial commitments to assist and support the banking clientele deemed by FSBNW as "too big to fail," and that such clientele were not members of a federally statutorily identified protected racial or ethnic classification.

134.     Plaintiffs allege that defendants named herein are conspiratorially liable under application of the **_Pinkerton_** Doctrine [**_Pinkerton, v. United States_**, 328 U.S. 640 (1946)] for the substantive KKK §§ 1981-1982 contraventions committed by defendants inasmuch as:

A.     Defendants engaged in the racially and ethnically offensive practices that constitute the contravention of KKK Sections 1981-1982;

29     AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

B.    Defendants are members of the KKK conspiracy designed and intended to contravene KKK Sections 1981-1982;

C.    Defendants engaged in activities in furtherance of advancing and promoting the KKK conspiracy designed and intended to contravene KKK Sections 1981-1982;

D.    All defendants are members of the KKK conspiracy at and during the time frame the racially and ethnically offensive practices were committed that constitute the contravention of KKK Sections 1981-1982; and,

E.    The offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

135.    Plaintiffs allege that plaintiffs are entitled to recovery compensatory damages. Plaintiffs are entitled to recovery of an award of attorneys' fees and costs pursuant to KKK §1988.

**WHEREFORE**, plaintiffs pray for judgment against defendants, and each and every one of them, jointly and severally, as follows:

1.    For compensatory damages, according to offer of proof at time of trial, arising from contravention of RICO § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code § 1962(c)], trebled pursuant to RICO Section 1964© [Title 18 United States Code § 1964(c)];

2.    For compensatory damages, according to offer of proof at time of trial, arising from contravention of RICO § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code § 1962(d)], trebled pursuant to RICO Section 1964© [Title 18 United States Code § 1964(c)];

3.    For recovery of attorneys' fees, expenses, and costs arising from contravention of RICO § 1962(c)-(d) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code § 1964(c)];

4.    For compensatory and exemplary damages, including attorneys' fees, costs, and expenses arising from contravention of Federal Ku Klux Klan Act of 1871 ["KKK"][Title 42 United States Code §§ 1981– 1982, and § 1988];

5.    For recovery under federal supplemental claims jurisdiction [Title 28 United States Code § 1367]; and,

6.    For such further and other relief as the Court deems just and proper in the premises.

Dated: 8 August 2012.

DEAN BROWNING WEBB, ESQUIRE,
WASH SBN # 10735
ATTORNEY AND COUNSELOR AT LAW
THE LAW OFFICES OF DEAN BROWNING WEBB
515 EAST 39TH STREET
VANCOUVER, WASHINGTON ZIP CODE 98663-2240
TELEPHONE: [503] 629-2176
ELECTRONIC MESSAGING ADDRESS: **ricoman1968@aol.com**
DEAN BROWNING WEBB
ATTORNEY AND COUNSELOR AT LAW
By: _/s/ **Dean Browning Webb**_____
DEAN BROWNING WEBB
ATTORNEYS AND COUNSELORS AT LAW FOR        PLAINTIFFS:

30    AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

1    Portfolio Investments, LLC, a Washington limited liability corporation;
2    Steven J. Nikolich, managing member, Portfolio Investments, LLC, a
     Washington limited liability corporation; Steven J. Nikolich, both
3    individually and upon behalf of the community property marital estate of
     Steven J. Nikolich and Marcia A. Nikolich; and, Marcia A. Nikolich, both
4    individually and upon behalf of the community property marital estate of
     Steven J. Nikolich and Marcia A. Nikolich

5    ///

6    ///

7    ///

8    ///

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

31   AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.

1    CERTIFICATE OF SERVICE

2        I, Dean Browning Webb, do certify and declare that on 8 August  2012:

3        Your declarant  electronically filed the foregoing amended complaint  pursuant to Court
Order entered 6 August 2012,    with the Clerk of the Court employing the CM/ECF System who
4    will send notification of such filing to the following parties who have appeared in this action as of
today's date:

5

6

7                Robert B. Lowry, Esq.,
                    email address: rlowry@kelrun.com
                Susan T. Alterman, Esq.
8                    email address: salterman@kelrun.com
                Kell Alterman & Runstein, LLP,
9                520 S.W. Yamhill Street
                Suite 600
10               Portland, OR 97204-1329
                Attorneys representing Defendant First Savings Bank Northwest, a Washington state
11               chartered bank

12

13               John E. Woodbery, P.S.
                800 Bellevue Way, NE Suite 400
14               Bellevue, WA 98004
                woodbery@gmail.com
15               Attorneys representing Defendants Tax Attorneys, Inc., Susan Chang, John E.
                Cicero, II, and Melanie Cicero
16

17

18               The Stephens Law Firm
                Jay Roderik Stephens, Esq.
19               300 North Meridian
                Puyallup, WA 98331
20               e mail address: rod@stephenslawfirm.com
                Attorneys representing Defendants, Victor Karpiak, First Financial Diversified
21               Corporation, a Washington corporation, and First Financial Northwest, Inc., a
                Washington corporation
22

23

24               Edward R. Coulson, Esq.
                Thomas Scott Linde, Esq.
                Schweet Rieke & Linde, PLLC
25               575 South Michigan Street
                Seattle, WA 98108
26               tomlinde@schweetlaw.com
                Coule@schweetlaw.com
27               Attorneys Representing Defendant John P. Mills
     ///
28   ///

1
        Christopher L. Reive, Esq.
        Jordan Ramis PC

2
        1498 SE Tech Center Pl
        Suite 380

3
        Vancouver, WA 98663
        chris.reive@jordanschrader.com

4
        Attorneys representing defendants David Kroeger, Jeffrey Gregg, and James Preston

5

6
        Robert E. West, Jr.
        West Law Offices PS

7
        332 1st Street NE
        Auburbn, WA 98002

8
        rwest@westlawoffices.com
        Attorneys representing Executive House, Inc.

9
        I declare under penalty of perjury, under the laws of the United States of America, that the

10
above is true and correct.

11
        Executed this _8th _ day of August, 2012, at Vancouver, Washington.

12

13
        By:/s/ Dean Browning Webb_____
            DEAN  BROWNING  WEBB

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33     AMENDED RICO COMPLAINT TITLE 18 U.S.C. §§ 1961 et.seq.