HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PORTFOLIO INVESTMENTS, LLC,
et al.,

                        Plaintiff,

        v.

FIRST SAVINGS BANK, et al.,

                        Defendants.

CASE NO. C12-104 RAJ

ORDER

## INTRODUCTION

This matter comes before the court on the motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) of the twelve named Defendants.  Dkt. ## 53 (Defendants Tax Attorneys, Inc., Susan Chang, and John E. Cicero, II (collectively, "TAI Defendants")); 62 (Defendant James Preston ("Preston")); 63 (Defendants First Savings Bank Northwest, Executive House, Inc., First Financial Northwest, Inc., First Financial Diversified Corporation, Victor Karpiak, David Kroeger, Jeff Gregg, and John Mills (collectively, "FSB Defendants")).  Plaintiffs Portfolio Investments, LLC, Steven J. Nikolich, and Marcia A. Nikolich ("Plaintiffs") oppose the motions.  Dkt. ## 56, 65, 68.

1    Plaintiffs set forth eleven claims for relief, naming twelve defendants.[1]  Dkt. # 51

2    at 19–30.  Plaintiffs' first eight claims allege violations of the Racketeer Influenced and

3    Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961–68.  In their first claim, Plaintiffs

4    allege that certain defendants violated § 1962(c), based on the predicate acts of mail and

5    wire fraud.  *Id.* ¶ 82.  Claims two through four flow from this primary claim, alleging that

6    certain defendants aided and abetted the primary violation, and that other defendants are

7    liable via the respondeat superior doctrine.  *Id.* at 19–20.  The sixth and seventh claims

8    for relief allege that certain defendants conspired to violate § 1962(c), and the fifth claim

9    alleges that certain defendants aided and abetted this conspiracy.  *Id.* at 21–24.  The

10   eighth claim for relief alleges that certain defendants are conspiratorially liable under the

11   *Pinkerton*[2] doctrine.  *Id.* at 24.  The ninth claim for relief alleges legal malpractice against

12   TAI Defendants.  *Id.* at 26.  Claims ten and eleven allege racial discrimination in

13   violation of 42 U.S.C. §§ 1981 and 1982.  *Id.* at 26–27.  For all of the reasons stated

14   herein, the court GRANTS each of the Defendants' motions to dismiss.[3]

15

16       [1] The original complaint named Justin Cicero and Metropolitan Realty Group ("MRG")

17   as defendants.  Dkt. # 1 at 2.  The amended complaint does not.  Dkt. # 51.  Instead, Plaintiffs
     ask this court to take "judicial notice" of the three complaints they filed against Justin Cicero and

18   MRG in bankruptcy court.  Dkt. # 58 at 2–3.  In their request for judicial notice Plaintiffs state
     that they are "preparing to file motions" withdrawing these adversary proceedings and having

19   them transferred to this court "for FRCP 42(a) consolidation purposes."  Dkt. # 58 at 3.  The
     bankruptcy court dockets indicate that Plaintiffs voluntarily dismissed these complaints on

20   November 19th and 20th, 2012.  *Portfolio Invs., LLC et al. v. Metropolitan Realty Group Inc. et
     al.*, Case Nos. 12-1730-KAO, Dkt. # 6; 12-1731-KAO, Dkt. # 26; 12-1732-KAO, Dkt. # 37.

21   However, there is no evidence that Plaintiffs ever sought to re-file or consolidate these
     complaints in this court.  The court therefore DENIES Plaintiffs' request to take judicial notice

22   of the bankruptcy complaints.

23       [2] *Pinkerton v. United States*, 328 U.S. 640 (1946).
         [3] This matter may be decided on the papers submitted.  Accordingly, the parties' request

24   for oral argument is DENIED.  The court also notes that FSB Defendants and Preston
     incorporated and adopted arguments in each others' briefs.  Dkt. ## 62 at 2; 62 at 2.  Although

25   the court appreciates the parties' attempt to consolidate the arguments, the result of the joinder is
     that the total number of pages submitted exceeds this district's local rules regarding brief length.

26   *See* W.D. Wash. L. Civ. R. 7(e)(3).  Nevertheless, the court will accept the overlength brief this
     time.  However, the court will not consider evidence that is outside the complaint or not subject

27

# BACKGROUND

Plaintiffs are commercial real estate developers. Dkt. # 51 (Amended Complaint) ¶ 9. In 2006, they had outstanding real estate loans with Executive House, Inc. ("EHI"). *See id.* ¶¶ 5, 9–11. In January 2006, John Mills, CEO of EHI, informed Plaintiffs that First Savings Bank Northwest ("FSB") had acquired EHI. *Id.* ¶ 1. Mills told Plaintiffs that FSB would continue to honor their pre-existing commercial business relationship. *Id.* ¶ 2.

That same year, Plaintiffs began a real estate development project in Gig Harbor, Washington. *Id.* ¶ 9. Plaintiffs obtained loans from FSB in order to purchase 14 residential lots and two commercial waterfront lots. *Id.* ¶¶ 11, 13. In the spring of 2008 the City of Gig Harbor gave Plaintiffs' development plan its final approval, and Plaintiffs sought additional financing in order to move forward on their project. *Id.* ¶ 12. They submitted to David Kroeger at FSB a five-inch binder containing their research data, costs and expenses, maps and images, and supporting financial documentation. *Id.*

When Plaintiffs had not heard from Kroeger for three weeks, they appeared at his office. *Id.* ¶ 16. They reminded Kroeger that he and Mills had previously assured Plaintiffs that FSB would continue to finance the Gig Harbor project. *Id.* ¶ 17. Kroeger responded that FSB was "no longer interested in financing real estate development projects across the board," but that Plaintiffs would "get all the help that [they] needed." *Id.* ¶¶ 18–19. During this meeting Kroeger also informed Plaintiffs that he "could not and would not modify any loans of any type." *Id.* ¶ 20.

Plaintiffs do not expressly state that they were having trouble making payments on their existing loans. However, they allude to this fact when they assert that in late December 2008 Kroeger told Plaintiffs that they could pay fifty percent of the interest on the loans "over the next few months." *Id.* ¶ 21. On December 28, 2008, Plaintiffs wrote

---

to judicial notice. The court therefore STRIKES Plaintiffs' "Declaration of Counsel" and "Declaration of Counsel [Supplemental]." Dkt. ## 57, 59.

FSB a check amounting to 50% of the interest payment. *Id.* ¶ 22. FSB did not accept the check, and instead returned it to Plaintiffs. *Id.* ¶ 23.

For the next few months, Plaintiffs and FSB attempted to resolve the loan issues that Plaintiffs were having. *Id.* ¶¶ 24–28. In May 2009, FSB and Plaintiffs agreed to a "Workout Plan," whereby FSB permitted Plaintiffs to make interest-only payments for 12 months. *Id.* ¶ 26–27. Plaintiffs made interest-only payments in June and July 2009. *Id.* ¶ 28. Plaintiffs have not alleged that they made any other payments.

In August 2009 Plaintiffs found out that "an insurance policy of [theirs] was being canceled." *Id.* ¶ 29. They assert that they had believed that FSB would keep their taxes and insurance current. *Id.* Concerned, they left numerous voice messages for Jeff Gregg at FSB, but did not receive any response. *Id.* ¶ 30. Meanwhile, Plaintiffs engaged in discussions and negotiations with potential buyers for their properties. *Id.* ¶ 31.

On October 8, 2009, Gregg gave Plaintiffs a list of their properties and their appraised values. *Id.* ¶ 32. Gregg told Plaintiffs that FSB would look at "short sales." *Id.* Later, Gregg told Plaintiffs that FSB's new asset manager, James Preston, would work with Plaintiffs to resolve their issues. *Id.* ¶ 34. Plaintiffs attempted to set up a meeting with Preston and other FSB representatives in early December, but FSB canceled or failed to appear for the meetings each time. *Id.* ¶¶ 36–38.

In January 2010 Plaintiffs heard from their tenants that "Notices of Default" dated December 30, 2009, were posted on Plaintiffs' commercial buildings. *Id.* ¶ 42. Plaintiffs allege that as a result of these notices tenants began withholding rent payments, and two tenants who had previously expressed interest in purchasing the properties changed their minds. *Id.* ¶¶ 42–43.

Plaintiffs met with FSB representatives Preston, Gregg, and Roger Gainer on January 20, 2010. *Id.* ¶ 44. Preston told Plaintiffs that he was "intent upon formulating a universal resolution to all of plaintiffs' commercial properties." *Id.* ¶ 45. Preston proposed that if Plaintiffs turned over all of their properties, then FSB would not pursue

1   deficiency judgments against them.  *Id.*  During this meeting, Preston also "inquired of

2   Steven J. Nikolich about the derivation of plaintiff's last name 'Nikolich.'"  *Id.* ¶ 124.

3   Mr. Nikolich responded that his "paternal grandparents came to the United States of

4   America from Serbia, which was part of the former Yugoslavia, via Ellis Island, New

5   York."  *Id.*  Plaintiffs do not allege that Preston communicated anything regarding this

6   exchange to any other individual or Defendant, or that any further discussion of the

7   matter ensued.

8           On January 28, 2010, Plaintiffs received an unsolicited letter from Tax Attorneys,

9   Inc. ("TAI").  *Id.* ¶ 48.  The letter stated that TAI provided "Attorney Short Sale

10  Negotiations," and that they used "unique Litigation in Washington State to completely

11  stop the Foreclosure action against your Mortgage or Deed of Trust."  *Id.* ¶ 49 (emphasis

12  omitted).  Plaintiffs immediately called TAI and spoke with attorney Chang.  *Id.* ¶ 50.

13  Chang told Plaintiffs that TAI would help them "achieve [a] universal resolution with

14  FSB."  *Id.*

15          On March 31, 2010, Plaintiffs met with TAI attorneys Chang and Cicero.  *Id.* ¶ 51.

16  Also present at the meeting was Justin Cicero, Cicero's son and director of Metropolitan

17  Realty Group ("MRG").  *Id.*  At that meeting, the TAI attorneys "represented to

18  plaintiffs" that they "possessed exclusive inside confidential information on several

19  financial institutions, including FSB[], and that the law firm sent [the] unsolicited letter to

20  plaintiffs because of their 'exclusive' access to such confidential information."  *Id.* ¶ 52.

21  Plaintiffs do not indicate what they discussed with the TAI attorneys at this meeting

22  regarding resolving their issues with FSB.  *See id.* ¶¶ 51–53.

23          Plaintiffs then resumed discussions with Preston and FSB.  *Id.* ¶ 56.  Plaintiffs

24  proposed having private investors purchase the outstanding balance of the loans at a 50%

25  discount.  *Id.*  They allege that various investors informed them that they had attempted

26  to contact Preston, but that he had not responded.  *Id.*  Auctions for the properties had

27  been scheduled for May 7, 2010, and the potential investors sought assurances that this

1    date would be continued.  *Id.* ¶¶ 56, 58.  Plaintiffs conveyed these concerns to Preston on

2    April 29, 2010.  *Id.* ¶ 58.

3         On May 4, 2010, Plaintiffs listed their commercial real estate properties with

4    MRG.  *Id.* ¶ 61.  On May 6th, TAI filed two bankruptcy petitions on behalf of Plaintiffs,

5    in order to stay the auctions scheduled for May 7th.  *Id.*  Plaintiffs assert that they

6    received a phone call from Preston the evening of May 6th, in which he stated that he had

7    received notice of the bankruptcy filings.  *Id.* ¶ 64.  He told Plaintiffs that FSB would

8    have extended the auction date, and that FSB was still interested in Plaintiffs' proposed

9    resolution.  *Id.*  Preston told Plaintiffs to have the TAI attorneys call him.  *Id.*

10        Plaintiffs immediately called Cicero.  *Id.* ¶ 65.  Plaintiffs informed him about the

11   conversation with Preston, and asked Cicero to call Preston immediately.  *Id.*  Cicero

12   responded that they should sit back and wait for Preston to put something in writing.  *Id.*

13   A week later Plaintiffs spoke with Chang, who also said that they should give FSB "a

14   couple of weeks."  *Id.* ¶ 66.  Preston subsequently called Plaintiffs and left "numerous"

15   messages stating that the TAI attorneys never contacted FSB.  *Id.* ¶ 68.  The TAI

16   attorneys were nonresponsive to Plaintiffs' continuing inquiries, and on June 19, 2010,

17   Plaintiffs sent TAI a letter expressing their frustration with TAI's representation.  *Id.*

18   ¶ 69–70.  They never received a response to their letter.  *Id.* ¶ 71.  On October 20, 2010,

19   Plaintiffs terminated the services of TAI and MRG.  *Id.* ¶ 75.  Plaintiffs filed the current

20   action on January 19, 2012.  Dkt. # 1.

21                                      **ANALYSIS**

22   **A.   Legal Standard**

23        To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a plaintiff's

24   complaint must set forth "enough facts to state a claim to relief that is plausible on its

25   face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P.

26   8(a)(2).  The facts alleged must demonstrate "more than a sheer possibility that a

27   defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

1  *Twombly*, 550 U.S. at 556).  For purposes of a motion to dismiss, the court accepts all

2  factual allegations—though not legal conclusions—as true.  *Id.*  Ultimately,

3  "[d]etermining whether a complaint states a plausible claim for relief will . . . be a

4  context-specific task that requires the reviewing court to draw on its judicial experience

5  and common sense." *Id.* at 679.

6  **B.   RICO** (claims one through eight)

7         RICO prohibits "person[s] employed by or associated with" an enterprise engaged

8  in or affecting interstate commerce from conducting the enterprise's affairs through a

9  "pattern of racketeering activity."  18 U.S.C. § 1962(c).  Relevant to this case,

10  "racketeering activity" includes mail and wire fraud.  *Id.* § 1961(1)(B).  A "pattern"

11  requires at least two acts of racketeering activity.  *Id.* § 1961(5).  RICO prescribes both

12  criminal penalties and civil remedies for violations of its provisions.  *Id.* §§ 1963

13  (criminal penalties); 1964 (civil remedies).  A plaintiff bringing a civil RICO claim must

14  set forth facts alleging that the defendant or defendants (1) conducted (2) an enterprise (3)

15  through a pattern (4) of racketeering activity.  *Id.* § 1962(c); *Sedima, S.P.R.L. v. Imrex*

16  *Co.*, 473 U.S. 479, 496 (1985).

17         As a threshold matter, a plaintiff seeking a remedy under RICO must first

18  demonstrate that he has standing to bring such claim.  18 U.S.C. § 1964(c) ("Any person

19  injured in his business or property by reason of a violation of section 1962 of this chapter

20  may sue therefor . . . ."); *see also Sedima*, 473 U.S. at 496.  To establish standing, a

21  plaintiff must demonstrate (1) that he has suffered harm to a specific business or property

22  interest, and (2) that the defendant or defendants' conduct in violating RICO's provisions

23  proximately caused that harm.  *See* 18 U.S.C. § 1964(c); *Sedima*, 473 U.S. at 496; *Diaz v.*

24  *Gates*, 420 F.3d 897, 900–01 (9th Cir. 2005).  To satisfy the first prong, a plaintiff must

25  identify both a concrete financial loss and a specific business or property interest.

26  *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008); *Diaz*, 420

27

1   F.3d at 900; *see also Thomas v. Baca*, 308 Fed. Appx. 87, 88 n.1 (9th Cir. 2009) (unpub.)

2   (underscoring the "concrete financial loss" requirement).

3          FSB Defendants argue that Plaintiffs "have failed to allege facts showing concrete

4   financial loss," and thus have no standing to bring their RICO claims.  Dkt. # 63 at 12–

5   13.  Plaintiffs' amended complaint fails to sufficiently identify the alleged loss, stating

6   only that the alleged activities "constitute conduct engaged in by defendants to deprive

7   plaintiffs of their interest in business and/or property."  Dkt. # 51 ¶ 82; *see Iqbal*, 556

8   U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere

9   conclusory statements, do not suffice.").  However, in their briefing Plaintiffs argue that

10  Defendants "deprived plaintiffs of their intangible property right to receive the rendition

11  of 'honest services' for purposes of federal mail fraud and wire fraud statutes.  18 U.S.C.

12  § 1346."[4]  Dkt. ## 56 at 11; 73 at 10; 74 at 12.  Plaintiffs erroneously rely upon *United*

13  *States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012).  In *Milovanovic*, the Ninth Circuit

14  Court of Appeals found that economic harm is not an element of honest services fraud

15  where the allegations concern defrauding the public.  *Id.* at 726–27.  However, the court

16  emphasized that it need not decide whether economic damages must be proven in a

17  private sector case.  *Id.*  Here, there are no allegations concerning defrauding the public,

18  and thus *Milovanovic* is inapplicable.  More importantly, *Milovanovic* is not a RICO case.

19         In RICO cases, the Ninth Circuit has held that "mere injury to a valuable

20  intangible property interest" is insufficient.  *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir.

21  2001).  Specifically, "deprivation of 'honest services' does not constitute concrete

22  financial loss."  *Id.*  Therefore, an alleged injury to the intangible right to receive honest

23  services does not confer standing to bring a RICO claim.  *United States v. Kincaid-*

24  *Chauncey*, 556 F.3d 923, 941 n.14 (9th Cir. 2009) (stating that "[t]he public's intangible

25

26         [4] Section 1346 states that "[f]or purposes of this chapter ["mail fraud and other fraud
    offenses"], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive
27  another of the intangible right of honest services."  18 U.S.C. § 1346.

1   right to honest services cannot be construed as 'property' traditionally understood," and

2   finding that deprivation of honest services is an insufficient injury to establish a RICO

3   claim) (citing *Ove*, 264 F.3d at 825).

4          Plaintiffs do not address FSB Defendants' standing argument, and they make no

5   attempt to identify any concrete financial loss.[5] Nor have Plaintiffs alleged any facts

6   demonstrating that the predicate acts proximately caused any injuries. *See Diaz*, 420 F.3d

7   at 901. Because Plaintiffs have failed to allege concrete financial loss and proximate

8   cause, they do not have standing to bring any of their RICO claims.

9          Plaintiffs' RICO claims also fail due to insufficient factual support for the alleged

10  predicate acts. The Supreme Court has held that the honest services fraud statute only

11  proscribes bribery and kickbacks. *United States v. Skilling*, ___ U.S. ___, 130 S. Ct.

12  2896, 2931 (2010). Plaintiffs have described neither bribery nor kickbacks as part of the

13  scheme alleged here. The court therefore dismisses Plaintiffs' RICO claims one through

14  eight.[6]

15  **C.   42 U.S.C. §§ 1981–1982** (tenth and eleventh claims for relief)

16         42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcement of

17  private contracts. Section 1982 prohibits racial discrimination in the purchasing of real

18  property. Both statutes can trace their origins to the Civil Rights Act of 1866, and, due to

19

20  _____

21         [5] Plaintiffs do allude to financial losses in their amended complaint, e.g., their tenants'
    withholding of rent payments, and the alleged loss of potential buyers for their properties. Dkt.
22  # 51 ¶¶ 42–43. However, Plaintiffs make no attempt to identify either of these (or anything else)
    as the alleged "injury," and rely instead on their argument that they were deprived of the
23  intangible right to honest services. *See, e.g.*, Dkt. # 73 at 11–13. Moreover, Plaintiffs fail to
    sufficiently allege that the predicate acts proximately caused these losses.
24         [6] Having dismissed the RICO claims on this basis, the court will not address Defendants'
25  other arguments for dismissal. However, the court notes that Defendants collectively presented
    several meritorious routes by which the court could have reached the same result, including
26  Plaintiffs' failures to plead fraud with particularity, plead any facts with regard to certain named
    defendants, plead with specificity the types of mails and wires used, or plead a specific intent to
27  defraud.

1   the statutes' "common language, origin, and purposes," courts construe them similarly.

2   *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 447–48 (2008).

3       Because proving discriminatory intent can be difficult if not impossible, courts

4   employ a burden-shifting analysis when evaluating discrimination claims.  *See Lindsey v.*

5   *SLT Los Angeles, LLC*, 447 F.3d 1138, 1144 (9th Cir. 2005) (citing *McDonnell Douglas*

6   *Corp. v. Green*, 411 U.S. 792, 802–03 (1973)).[7]  Initially, the plaintiff has the burden to

7   allege facts supporting the elements of a prima facie case of discrimination.  *Id.* at 1144.

8   Once he has done so, the burden shifts to the defendant to offer evidence of a non-

9   discriminatory reason for the adverse action.  *Id.* at 1144.  If the defendant produces such

10  evidence, the burden shifts back to the plaintiff to demonstrate that the defendant's

11  proffered reason is mere pretext.  *Id.*

12  1.   <u>Section 1981</u>

13      A prima facie case for a § 1981 discrimination claim requires a plaintiff to

14  demonstrate that "(1) [he] is a member of a protected class,[8] (2) [he] attempted to

15  contract for certain services, . . . (3) [he] was denied the right to contract for those

16  services," and (4) "such services remained available to similarly-situated individuals who

17

18      [7] In *McDonnell Douglas* the Supreme Court considered a Title VII employment
    discrimination claim, and set forth the elements of a prima facie case in that context: "(i) that [the
19  plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which
    the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and
20  (iv) that, after his rejection, the position remained open and the employer continued to seek
    applicants from persons of complainant's qualifications."  411 U.S. at 802.  These elements have
21  become the foundation for discrimination claims in numerous contexts.  *See, e.g.*, *Lindsey*, 447
    F.3d at 1144–45.
22      [8] Plaintiffs allege that Nikolich is an ethnic Slav, and thus a member of a protected class.
23  Dkt. # 51 ¶ 123.  In *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987), the Supreme
    Court analyzed § 1981 and found that "Congress intended to protect from discrimination
24  identifiable classes of persons who are subjected to intentional discrimination solely because of
    their ancestry or ethnic characteristics."  As an ethnic Slav, Nikolich is a member of an
25  identifiable ethnic group that could potentially face discrimination on that basis.  *See, e.g.*,
    *Assenov v. Univ. of Utah*, 553 F. Supp. 2d 1319, 1333 (D. Utah 2008).  While Nikolich also
26  seems to allege discrimination based on national origin, which is not a protected class under
    § 1981, his assertion that he is an ethnic Slav is sufficient for purposes of this motion.
27

ORDER- 10

1   were not members of the plaintiff's protected class."[9]  *Lindsey*, 447 F.3d at 1145.  In the

2   instant case, Plaintiffs have failed to allege facts sufficient to support the fourth prong,

3   and have thus failed to set forth a prima facie case of discrimination.

4          The fourth prong requires a plaintiff to demonstrate that a similarly situated

5   person, not in the plaintiff's protected class, was treated more favorably.  *See Moran v.*

6   *Selig*, 447 F.3d 748, 755 (9th Cir. 2006).  The comparator must be similar in "all material

7   respects."  *Id.*  This is a stringent test.  *Blair v. Alaskan Copper & Brass Co.*, Case No.

8   C07-1877-RAJ, 2009 WL 2029963, at *7 (W.D. Wash. July 10, 2009).  Plaintiffs argue

9   that FSB gave "[other] clientele who were not of Slavic origin" the financial assistance

10  that they sought.  Dkt. # 51 ¶ 128 (emphasis omitted).  As examples they cite three FSB

11  clients, who they contend are not Slavic, who obtained relief from FSB.  *Id.*  However,

12  Plaintiffs fail to demonstrate that these clients were similarly situated in all material

13  respects.  The only similarity Plaintiffs identify is that they had all originally obtained

14  their financing through EHI.  *Id.*  In fact, Plaintiffs assert that the three clients FSB

15  allegedly treated more favorably had outstanding commercial real property projects worth

16  $60 million, $31 million, and $20 million, respectively, and that FSB "would incur

17  substantial monetary losses" if these clients defaulted on their loans.  *Id.*  Plaintiffs do not

18  assert that the same would be true if they were to default on their loans.  Additionally, in

19  trying to establish a "pattern of racketeering activity" for their RICO claims, Plaintiffs

20  identify "similarly situated *victims* that experienced comparable losses by and through the

21  _____

22          [9] The *Lindsey* court noted that the Sixth Circuit employs a slightly different final element.
    447 F.3d at 1145.  Recognizing that plaintiffs alleging discrimination in the contracting-for-
23  services context may have no way of knowing how others were treated, the Sixth Circuit
    alternatively considers whether the "plaintiff received services in a markedly hostile manner and
24  in a manner which a reasonable person would find objectively discriminatory."  *Id.* (citing
    *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001)).  The *Lindsey* court
25  applied the traditional "similarly situated" element, though it recognized that the Sixth Circuit's
    reasoning for applying an alternative test was compelling, and left open the possibility that this
26  alternative test may be appropriate in some cases.  *Id.*  This court will employ the "similarly
    situated" analysis, but notes that under the Sixth Circuit's test, the result would be the same—
27  Plaintiffs have made no allegation of "marked hostility."

ORDER- 11

1    activities engaged herein by RICO defendants," and cite other cases in which these

2    victims have filed claims against FSB.  *See* Dkt. # 51 ¶ 78 (emphasis added).  Plaintiffs

3    make no allegations that these "similarly situated victims" were also members of a

4    protected class, thus undercutting Plaintiffs' argument that Preston and FSB treated

5    Plaintiff Nikolich (or anyone else) differently due to ethnic affiliation.  *See id.*  Because

6    Plaintiffs have failed to demonstrate that Preston and FSB treated other similarly situated

7    clients more favorably, their § 1981 claims fail.

8    2.    Section 1982

9          The prima facie elements of a § 1982 claim require a plaintiff to demonstrate that

10   (1) he is a member of a racial minority; (2) he applied for and was qualified to rent or

11   purchase certain property or housing; (3) he was rejected; and (4) the housing or rental

12   opportunity remained available thereafter."  *Phiffer v. Proud Parrot Motor Hotel, Inc.*,

13   648 F.2d 548, 551 (9th Cir. 1980).  Here, Plaintiffs have failed to allege facts sufficient to

14   demonstrate that they were qualified for "financial infusion" that they sought from FSB.

15   Plaintiffs' § 1982 claim fails on this basis.  The court therefore dismisses Plaintiffs'

16   claims ten and eleven.

17   **D.  Legal Malpractice** (ninth claim for relief)

18         TAI Defendants request that this court dismiss without prejudice the remaining

19   state law claim of malpractice, so that it may be re-filed in state court.  Dkt. # 53 at 11–

20   12.  In their response, Plaintiffs provide no legal authority or argument as to why this

21   claim should not be dismissed.  Dkt. # 56 at 25.  Where a federal court has dismissed all

22   of the claims over which it had original jurisdiction, the balance of factors will typically

23   weigh against the district court continuing to exercise supplemental jurisdiction.  *Johnson*

24   *v. City of Seattle*, 385 F. Supp. 2d 1091, 1100 (W.D. Wash. 2005).  However, if the

25   federal court has already invested considerable resources in the case, retention of the case

26   is proper.  *Id.*  Here, the court has not invested substantial resources thus far, and has not

27   reached any of the merits of Plaintiffs' legal malpractice claim.  The court therefore

declines to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). The court notes that, pursuant to 28 U.S.C. § 1367(d), the statute of limitations for Plaintiffs' state law claim has been and will continue to toll for thirty days after the entry of this order. Accordingly, the court dismisses the legal malpractice claim, without prejudice.

**E.   Leave to Amend**

Plaintiffs did not request leave to amend their complaint in the event that this court dismissed their claims, nor is leave to amend warranted. This is the second opportunity that Plaintiffs have had to sufficiently plead their claims in this court. *See* Dkt. ## 1; 50 at 2. Plaintiffs' amended complaint continues to lack sufficient allegations to support their claims, and Plaintiffs give no indication that they would be able to cure the deficiencies in a second amended complaint. Allowing leave to amend would therefore be futile and prejudicial to Defendants. *See United States v. Pend Oreille Public Utility Dist. No. 1*, 926 F.2d 1502, 1511–12 (9th Cir. 1991).

**CONCLUSION**

For all of the foregoing reasons, the court rules as follows:

(1)  The court GRANTS the motions to dismiss, with prejudice, claims one through eight and ten through eleven.

(2)  The court GRANTS the motion to dismiss, without prejudice, claim for relief nine. Plaintiffs may re-file this claim in state court.

Dated this 20th day of March, 2013.

*Richard A Jones*

The Honorable Richard A. Jones
United States District Judge

ORDER- 13